# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
February 8, 2011

No. 09-20084

Lyle W. Cayce
Clerk

SPECTRUM STORES INC; MAJOR OIL COMPANY INC; WC RICE OIL COMPANY; FAST BREAK FOODS LLC

Plaintiffs - Appellants

v.

CITGO PETROLEUM CORPORATION; SAUDI ARABIAN OIL COMPANY, doing business as Saudi Aramco; SAUDI PETROLEUM INTERNATIONAL INC; ARAMCO SERVICES COMPANY; SAUDI REFINING INC; MOTIVA ENTERPRISES LLC; PETROLEOS DE VENEZUELA SA; PDV AMERICA INC; PDV MIDWEST REFINING LLC; PDV HOLDING INC; OPEN JOINT STOCK COMPANY, "Oil Company Lukoil", also known as Lukoil Holings, also known as Lukoil OAO, also known as OAO Lukoil; LUKOIL AMERICAS CORPORATION; GETTY PETROLEUM MARKETING; LUKOIL INTERNATIONAL TRADING AND SUPPLY COMPANY; LUKOIL PAN AMERICAS LLC

Defendants - Appellees

SPECTRUM STORES INC; MAJOR OIL COMPANY INC; WC RICE OIL COMPANY INC

Plaintiffs - Appellants

v.

CITGO PETROLEUM CORPORATION

Defendant - Appellee

FAST BREAK FOODS LLC, on behalf of itself and all others similarly situated

No. 09-20084

Plaintiff - Appellant

v.

SAUDI ARABIAN OIL COMPANY, doing business as Saudi Aramco; SAUDI PETROLEUM INTERNATIONAL INC; ARAMCO SERVICES COMPANY; SAUDI REFINING INC; MOTIVA ENTERPRISES LLC; PETROLEOS DE VENEZUELA SA; PDV AMERICA INC; CITGO PETROLEUM CORPORATION; PDV MIDWEST REFINING LLC; PDV HOLDING INC

Defendants - Appellees

---

GREEN OIL CO, on behalf of itself and all others similarly situated

Plaintiff - Appellant

v.

SAUDI ARABIAN OIL COMPANY, doing business as Saudi Aramco; SAUDI PETROLEUM INTERNATIONAL INC; ARAMCO SERVICES COMPANY; SAUDI REFINING INC; MOTIVA ENTERPRISES LLC; PETROLEOS DE VENEZUELA SA; PDV AMERICA INC; CITGO PETROLEUM CORPORATION; PDV HOLDING INC; PDV MIDWEST REFINING LLC; OPEN JOINT STOCK COMPANY, "Oil Company Lukoil" also known as Lukoil Holdings, also known as Lukoil OAO, also known as OAO Lukoil; LUKOIL AMERICAS CORPORATION; GETTY PETROLEUM MARKETING INC; LUKOIL PAN AMERICAS LLC

Defendants - Appellees

---

COUNTRYWIDE PETROLEUM CO; FAST BREAK FOODS, LLC

Plaintiffs - Appellants

v.

PETROLEOS DE VENEZUELA SA; PDV AMERICA INC; CITGO PETROLEUM CORPORATION; PDV HOLDING INC; PDV MIDWEST REFINING LLC

2

No. 09-20084

Defendants - Appellees

---

FAST BREAK FOODS LLC

Plaintiff - Appellant

v.

CENTRAL OHIO ENERGY INC, on behalf of itself and all others similarly situated; FAST BREAK FOODS LLC

Plaintiffs - Appellants

v.

SAUDI ARABIAN OIL COMPANY, doing business as Saudi Aramco; SAUDI PETROLEUM INTERNATIONAL INC; ARAMCO SERVICES COMPANY; SAUDI REFINING INC; MOTIVA ENTERPRISES LLC; PETROLEOS DE VENEZUELA SA; PDV AMERICA INC; CITGO PETROLEUM CORPORATION; PDV HOLDING INC; PDV MIDWEST REFINING LLC; OPEN JOINT STOCK COMPANY, "Oil Company Lukoil", also known as Lukoil Holdings, also known as Lukoil OAO, also known as OAO Lukoil; LUKOIL AMERICAS CORPORATION; LUKOIL PAN AMERICAS LLC; GETTY PETROLEUM MARKETING INC

Defendants - Appellees

---

Appeals from the United States District Court
for the Southern District of Texas

---

Before JOLLY, WIENER, and STEWART, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This case involves two class actions brought by gasoline retailers against oil production companies (most of which are owned in whole or in part by OPEC member nations), alleging antitrust violations. After consolidation of the suits

3

No. 09-20084

for disposition of pre-trial matters, the oil production companies moved to dismiss. The district court granted dismissal on the ground that disposing of the case on the merits would require the court to pass judgment on the actions of other sovereign nations, which is proscribed by the act of state doctrine. Alternatively, the district court held that dismissal was also warranted by the political question doctrine. The gasoline retailers appealed.

Because the political question doctrine is jurisdictional, we address it first. When we do so, we discern that the complaints before us effectively challenge the structure of OPEC and its relation to the worldwide production of petroleum. Convinced that these matters deeply implicate concerns of foreign and defense policy, concerns that constitutionally belong in the executive and legislative departments, we conclude that we lack jurisdiction to adjudicate the claims. We hold alternatively that the complaints seek a remedy that is barred by the act of state doctrine, that is, an order and judgment that would interfere with sovereign nations' control over their own natural resources. Accordingly, we affirm the judgment dismissing the complaints.

## I.

Several U.S. gasoline retailers and other purchasers of petroleum products allege Sherman Act and Clayton Act violations by oil production companies. The Spectrum Appellants[1] sued Citgo Petroleum Corporation (Citgo); the Consolidated Appellants[2] sued the Saudi Aramco Appellees,[3] the Citgo

---

[1] We use "Spectrum Appellants" to refer to: Spectrum Stores, Inc., Major Oil Co., Inc., W.C. Rice Oil Co., Inc., and Abston Petroleum, Inc.

[2] We use "Consolidated Appellants" to refer to: Fast Break Foods, LLC, S-Mart Petroleum Inc., Green Oil Co., Countrywide Petroleum Co., and Central Ohio Energy, Inc.

[3] We use "Saudi Aramco Appellees" to refer to: Saudi Arabian Oil Company (d/b/a Saudi Aramco), Saudi Petroleum International, Inc., Aramco Services Company, and Saudi Refining, Inc. The Saudi Aramco Appellees are owned by Saudi Arabia. Saudi Aramco is the national oil company of Saudi Arabia, and Saudi Petroleum International, Aramco Services, and Saudi Refining are wholly owned subsidiaries of Saudi Aramco.

No. 09-20084

Appellees,[4] the Lukoil Appellees,[5] and Motiva Enterprises, LLC (Motiva).[6] Five suits from different districts were consolidated in the Southern District of Texas for disposition of pre-trial matters. At the time of the appealed-from decision, only two live complaints were before the district court.[7] The Spectrum Appellants decided to stand on their original complaint, while the Consolidated Appellants chose to file an amended, consolidated class-action complaint in place of their individual complaints.

## A.

The claims raised by Appellants challenge the traditional structure of international energy policy. The global economy is driven by petroleum-based products, and countries with bountiful petroleum resources have attempted to secure the best market prices for their crude oil. With this goal in mind, several oil-rich nations formed the Organization of Petroleum Exporting Countries

---

[4] We use "Citgo Appellees" to refer to: Petroleos de Venezuela S.A. ("PDVSA" or "PdVSA"), PDV America, Inc., Citgo, PDV Holding, Inc., and PDV Midwest Refining, LLC. The Citgo Appellees are owned by Venezuela. PDVSA is the national oil company of Venezuela, and PDV America, Citgo, PDV Holding, and PDV Midwest Refining are wholly owned subsidiaries of PDVSA. Saudi Refining holds half of the shares of Motiva, while Shell Oil Corporation owns the other half.

[5] We use "Lukoil Appellees" to refer to: Open Joint Stock Company (a/k/a Oil Company Lukoil, a/k/a OAO Lukoil, a/k/a/ Lukoil OAO, a/k/a Lukoil Holdings), Lukoil Americas Corporation, Lukoil International Trading and Supply Company (LITASCO), Lukoil Pan Americas LLC, and Getty Petroleum Marketing, Inc. The Lukoil Appellees are privately owned companies, and Lukoil Americas, LITASCO, Lukoil Pan Americas, and Getty Petroleum are wholly owned subsidiaries of Lukoil.

[6] Not all of the named defendants were served with process; those who were not are not parties to this appeal. The defendants who were served were: Aramco Services Company, Saudi Petroleum International, Inc., Saudi Refining, Inc., Motiva, PDV America, Inc., Citgo, PDV Holding, Inc., PDV Midwest Refining, LLC, Lukoil Americas Corporation, Lukoil Pan Americas LLC, and Getty Petroleum Marketing, Inc. The district court's dismissal affected all named defendants, not just those who were served.

[7] A third complaint was before the district court, but it is not relevant to this appeal.

No. 09-20084

("OPEC") in the 1960s.[8]  OPEC's official mission is "to coordinate and unify the petroleum policies of its Member Countries and ensure the stabilization of oil markets in order to secure an efficient, economic and regular supply of petroleum to consumers, a steady income to producers and a fair return on capital for those investing in the petroleum industry." *See* Organization of the Petroleum Exporting Countries, OPEC: Our Mission, http://www.opec.org/opec_web/en/about_us/23.htm (last visited December 30, 2010).

In the years since OPEC's inception, its members have developed nationally owned oil production companies, and these companies have formed and acquired subsidiaries, many of which operate within the United States. OPEC member nations attend periodic meetings at the organization's headquarters in Vienna, Austria to formulate policy.  In recent years, some privately owned corporations have begun attending OPEC meetings.  The Appellants in this case allege that the national oil companies, as well as their subsidiaries, have conspired with OPEC member nations to fix prices of crude oil and refined petroleum products ("RPPs") in the United States, primarily by limiting crude-oil production—that is, by controlling the spigot.

### 1.

The Spectrum Appellants accuse Citgo of conspiring with OPEC member nations "to raise, fix, and stabilize the price of gasoline and other oil-based products in the United States."  Citgo is wholly owned by Venezuela, through PDVSA, the national oil company of Venezuela.  The Spectrum Complaint asserts three counts against Citgo under § 1 of the Sherman Act, 15 U.S.C. § 1,

---

[8] The OPEC member nations currently include Algeria, Angola, Ecuador, Iran, Iraq, Kuwait, Libya, Nigeria, Qatar, Saudi Arabia, the United Arab Emirates, and Venezuela. *See* Organization of the Petroleum Exporting Countries, OPEC: Member Countries, http://www.opec.org/opec_web/en/about_us/25.htm (last visited December 30, 2010).

6

No. 09-20084

and § 4 of the Clayton Act, 15 U.S.C. § 15.[9]  The first count seeks to hold Citgo liable for directly agreeing to participate in "OPEC's price-fixing conspiracy to sell oil-based products at anti-competitive prices in the United States."  The other two counts attempt to hold Citgo liable for agreeing to assist Venezuela and its parent corporations with their participation in OPEC.  The Spectrum Complaint seeks actual, future, punitive, and treble damages; disgorgement of profits; injunctive relief against continued price-fixing; and costs of suit under the Clayton Act, 15 U.S.C. §§ 15, 26.

The Spectrum Complaint alleges that OPEC member nations have agreed to adjust or cap production of oil on numerous occasions in order to maintain oil prices within an agreed price range.  The Spectrum Complaint also alleges that the conspiracy is commercial in nature, rather than political or sovereign, as evidenced by the fact that OPEC member nations have acquired refineries and distribution facilities in key markets, including the United States.

**2.**

The Consolidated Appellants accuse all the Appellees of "participat[ing] in a conspiracy to fix, raise, maintain and stabilize the prices of refined petroleum products sold . . . in the United States."  The Consolidated Appellants contend that this constitutes a *per se* violation of § 1 of the Sherman Act and § 4 of the Clayton Act.  They also seek relief under § 16 of the Clayton Act, including actual and treble damages and costs of suit, as well as injunctive relief—including the foreign-based companies' divestiture of their U.S. subsidiaries.  15 U.S.C. § 26.

The Consolidated Complaint alleges that the price-fixing conspiracy has been implemented principally through (1) agreements between Appellees to

---

[9] Section 4 of the Clayton Act "provides the private right of action to enforce the Sherman Act." *Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 961 F.2d 1148, 1159 (5th Cir. 1992).

No. 09-20084

restrain the output of crude oil, and (2) agreements between Appellees to restrict operating capacity of crude-oil refineries, some of which are located within the United States.   The Consolidated Complaint is more circumspect than the Spectrum Complaint in its discussion of OPEC and its members, declining to directly name the organization or its members as coconspirators.   However, the Consolidated Complaint gives a detailed description of the formation and function of OPEC as background for its allegations as to the alleged conspiracy, and it frequently refers to OPEC meetings and statements in a list of actions that purportedly demonstrate knowing participation in the conspiracy by Appellees.

### B.

The Appellees moved to dismiss both complaints on several grounds. Primarily, they argued that dismissal was proper under Federal Rule of Civil Procedure 12(b)(1), because the claims pose nonjusticiable political questions, and under Rule 12(b)(6), because Appellants failed to state a claim for relief under the act of state doctrine.[10]

### 1.

The district court granted Appellees' motion to dismiss both complaints on the act of state and political question grounds.   It considered both motions under Rule 12(b)(6).   Generally, the district court characterized the complaints as challenging "the decisions of sovereign states to restrict the production of crude oil located within their own territories."   *In re Refined Petroleum Prods.*

---

[10] The district court requested that the initial motion to dismiss be limited to the following doctrines common to both complaints: act of state; political question; international comity; indirect purchaser; and *Noerr–Pennington*.   The parties did not raise arguments regarding possible immunity under the Foreign Sovereign Immunities Act (FSIA), and they did not make arguments based on *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).   The district court expressly did not rule on the international comity, indirect purchaser, or *Noerr–Pennington* doctrines. *See In re Refined Petroleum Prods. Antitrust Litig.*, 649 F. Supp. 2d 572, 598 (S.D. Tex. 2009).

No. 09-20084

*Antitrust Litig.*, 649 F. Supp. 2d 572, 597 (S.D. Tex. 2009).  According to the district court, the Spectrum Complaint alleges that Citgo "facilitated, enabled, and provided direct assistance to the [OPEC] cartel's price-fixing scheme by (1) purchasing crude oil produced by foreign sovereigns, (2) providing technical assistance to OPEC in the form of information about United States markets, and (3) allowing its executives to participate in OPEC's meetings and strategic planning efforts."  *Id.* at 585 (internal quotation marks and modifications omitted).  However, as the Spectrum Complaint "alleges that the price-fixing at issue is caused by the production decisions of the sovereign state members of the conspiracy," the district court concluded that adjudication of the claims raised in the Spectrum Complaint would require the court to pass judgment on the legality of crude-oil production decisions made by foreign sovereigns.  *Id.*

As to the Consolidated Complaint, the district court noted that unlike the Spectrum Complaint—which expressly refers to OPEC and its members as coconspirators in the alleged conspiracy—the Consolidated Complaint is "artfully worded to limit reference to the actions performed by the sovereign members of the conspiracy . . . [and] minimizes its description of the acts performed by the conspiracy's sovereign members."  *Id.* at 586.  However, the district court ultimately concluded that the specific factual allegations of the Consolidated Complaint also show that the alleged price-fixing is caused by the production decisions of the sovereign members of the conspiracy, and therefore the pleaded conspiracy "consists of agreements entered by foreign sovereign states to limit their production of crude oil" and "the actions attributed to the named defendants are actions that merely facilitate, enable, and assist the foreign sovereign state members of the conspiracy."  *Id.* at 587.

Accordingly, the district court held that both complaints required the court to sit in judgment on the decisions and agreements reached by the foreign sovereigns regarding the production of crude oil within their own territories, an

inquiry squarely barred by the act of state doctrine.  On the question whether the complaints pose a nonjusticiable political question, the district court found that "the adjudication of claims that require the court to determine the legality of crude oil production decisions of foreign sovereigns would express a lack of respect for the Executive Branch because of its longstanding foreign policy that issues relating to crude oil production by foreign sovereigns be resolved through intergovernmental negotiation."  *Id.* at 597.  The district court noted in particular that the United States has never sought antitrust sanctions against any oil-producing countries.[11]

### 2.

The parties vigorously contest whether the district court correctly portrayed the factual allegations of the complaints.  As noted above, the district court read both complaints as "challeng[ing] the decisions of sovereign states to restrict the production of crude oil located within their own territories."  *Id.* According to the district court, the actions attributed to Appellees "merely facilitate, enable, and assist the foreign sovereign state members of the conspiracy."

We agree with the district court that both the Spectrum and Consolidated Appellants' complaints allege an overarching conspiracy between OPEC member nations to fix the price of crude oil and RPPs in the United States.  Both

---

[11] We also have before us thirteen amicus briefs in support of Appellees and affirmance. The following foreign sovereigns submitted amicus curiae briefs: Algeria; the Bolivarian Republic of Venezuela; the Federal Republic of Nigeria; the Kingdom of Saudi Arabia;  the Republic of Indonesia; the Republic of Iraq; the Russian Federation; the State of Kuwait; the State of Qatar; the United Arab Emirates; and the United Mexican States. The U.S. Chamber of Commerce also submitted an amicus brief in support of Appellees and affirmance, as did the U.S. Departments of State, Treasury, Energy, and Justice.  These amicus briefs consistently emphasize that each nation views its natural resources as exclusively under its sovereign control.  Additionally, the amici warn that a ruling on the merits of these suits would undermine the longstanding practice of using diplomatic efforts to resolve issues involving energy policy.

No. 09-20084

complaints allege that this conspiracy is carried out through oil production companies (most of which are wholly owned by sovereign nations) and their subsidiaries. The Spectrum Complaint focuses solely on crude-oil production limits as the method used to implement the alleged price-fixing conspiracy; the Consolidated Complaint, in addition to alleging a production conspiracy, includes some allegations that refining decisions were also used to implement the conspiracy. The Consolidated Complaint names Lukoil, a privately traded Russian oil company and its subsidiaries, and Motiva, owned half by Saudi Refining and half by Shell Oil Corporation, in addition to national oil companies and their wholly owned subsidiaries.

The Consolidated Appellants argue that the district court erred by characterizing their complaint as alleging a conspiracy among sovereign nations to fix prices via production limits, with the role of the named defendants limited to facilitation. They argue that the Consolidated Complaint alleges that commercial corporations, rather than governments, have taken over the production of crude oil, and that the district court failed to view the complaint in the light most favorable to them by ignoring these allegations. However, we agree with the district court that the core of the alleged conspiracy, as is true of the Spectrum Complaint, consists of agreements entered into by foreign sovereign states to limit production of crude oil. While the Consolidated Complaint does, in some places, allege that oil production companies—specifically, PDVSA, Saudi Aramco, Lukoil, and their subsidiaries—make the ultimate decisions about the volume of crude oil produced, the Complaint is internally inconsistent on this point, as the district court noted.[12] The Consolidated Complaint describes the history of OPEC,

---

[12] Although the Consolidated Complaint attempts to omit any reference to nations controlling production decisions, it fails to do so completely; this leaves the Complaint infected with inconsistent references to countries making production decisions and participating in the

No. 09-20084

including its formation and expansion, as background for the conspiracy allegations. We are simply unable to ignore the involvement of foreign nations in the conspiracy as pleaded in the Consolidated Complaint.

Moreover, the Consolidated Appellants have failed to allege an independent conspiracy based on refining decisions. The Complaint asserts that Appellees "and their subsidiaries joined other co-conspirators and adopted a common formula for crude oil pricing and RPP pricing that was based on target profit margins on the sale of RPPs in the United States," and that one method of implementing this pricing formula was to "restrict[ ] the operating capacities of their crude oil refineries in order to increase the price of RPPs." Beyond this conclusory language, the Consolidated Complaint contains no further details about the refining segment of the alleged conspiracy. "[A] conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007). The Consolidated Complaint thus fails plausibly to allege a conspiracy based on refining agreements independent from the broader production-oriented conspiracy.

We thus agree with the district court's characterization of both complaints. Appellants allege an overarching conspiracy between sovereign nations to fix prices of crude oil and RPPs by limiting the production of crude oil. Although they allege that this primary conspiracy was facilitated through refining

conspiracy. For example, as evidentiary support for the proposition that Saudi Aramco, PDVSA, and Lukoil agreed with other coconspirators to decrease production of crude oil, the Consolidated Complaint offers the following: "Together with promises from non-OPEC *nations* Russia, Oman and Mexico, world oil producers have pledged to cut world wide production by approximately 3.1 million [barrels per day]" (emphasis added). The Consolidated Complaint further alleges that "Citgo has provided PDVSA and defendants with information, including data on the United States oil market, and technical services that greatly assist in the efforts of PdVSA *and Venezuela* to fix the price of oil and RPPs at anticompetitive levels." Attempting to establish agreements about production cuts, the Complaint also repeatedly quotes Rafael Ramirez Carreno, who is both President of PDVSA and Venezuela's Oil Minister.

12

No. 09-20084

decisions, any allegations regarding price-fixing through manipulation of refining capacity are secondary to the overarching production-based conspiracy.

## C.

This court has jurisdiction over Appellants' timely appeal under 28 U.S.C. § 1291. The district court dismissed Appellants' claims on both act of state and political question grounds for failure to state a claim under Rule 12(b)(6). As discussed *infra*, we view a dismissal on grounds that this case presents a nonjusticiable political question as a Rule 12(b)(1) dismissal for lack of subject matter jurisdiction, while the act of state ruling is a Rule 12(b)(6) dismissal for failure to state a claim. This interpretation does not alter our standard of review, which is *de novo* on both grounds for dismissal. *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008). In undertaking this review, "we take the well-pled factual allegations of the complaint as true and view them in the light most favorable to the plaintiff." *Id.*

## II.

For the reasons that follow, we hold that adjudication of Appellants' claims is jurisdictionally barred by the political question doctrine. While our political question analysis disposes of the case, it also reveals why Appellants' suit fails to state a claim under the act of state doctrine.

## A.

We first address whether this suit is prohibited by application of the political question doctrine. Reviewing the district court's decision *de novo*, we treat the Appellees' original motion to dismiss on political question grounds as a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. FED. R. CIV. P. 12(b)(1). We do so because "[t]he concept of justiciability," as embodied in the political question doctrine, "expresses the jurisdictional limitations imposed upon federal courts by the 'case or controversy' requirement of Art[icle] III." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 215 (1974).

No. 09-20084

*See also Massachusetts v. EPA*, 549 U.S. 497, 516 (2007) (noting, in the light of the fact that "Article III of the Constitution limits federal-court jurisdiction to 'Cases' and 'Controversies,'" that it is "familiar learning that no justiciable 'controversy' exists when parties seek adjudication of a political question"); *Baker v. Carr*, 369 U.S. 186, 198 (1962) ("Our conclusion that this cause presents no nonjusticiable 'political question' settles the only possible doubt that it is a case or controversy."); *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008) ("A declination of *jurisdiction* under the doctrine presupposes that another branch of government is both capable of and better suited for resolving the 'political' question.") (emphasis added); *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 982 (9th Cir. 2007) ("We hold that if a case presents a political question, we lack subject matter jurisdiction to decide that question."); *Schneider v. Kissinger*, 412 F.3d 190, 193 (D.C. Cir. 2005) ("The principle that the courts lack jurisdiction over political decisions that are by their nature committed to the political branches to the exclusion of the judiciary is as old as the fundamental principle of judicial review.") (internal quotation marks omitted).

In contrast to political question claims, and "[u]nlike a claim of sovereign immunity, which merely raises a jurisdictional defense," the Supreme Court has stated that "the act of state doctrine provides foreign states with a substantive defense on the merits." *Republic of Austria v. Altmann*, 541 U.S. 677, 700 (2004). *See also Samantar v. Yousuf*, 130 S.Ct. 2278, 2290 (2010). Because the parties' political question arguments go to the predicate issue of jurisdiction, we address these arguments first. We agree with the district court that adjudication of the case is barred by application of the political question doctrine.

**B.**

At its core, the political question doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress

14

or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986). In *Baker v. Carr*, the Supreme Court set forth the seminal test for analyzing whether a claim presents a political question. 369 U.S. at 217. The Court outlined six factors, any one of which is sufficient to indicate the presence of a nonjusticiable political question:

> "[1.] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2.] a lack of judicially discoverable and manageable standards for resolving it; or [3.] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4.] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5.] an unusual need for unquestioning adherence to a political decision already made; or [6.] the potentiality of embarrassment from multifarious pronouncements by various departments on one question."

*Id. See also Vieth v. Jubelirer*, 541 U.S. 267, 277 (2004) (noting that *Baker* set forth "six independent tests for the existence of a political question"). These factors guide our analysis of the claims before us. Our review does not overlook the Supreme Court's observation in *Baker* that cases implicating foreign relations involve "a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action." *Baker*, 369 U.S. at 211–12. Applying this directive, the following discussion indicates that the matter before us plainly constitutes a political question.

### 1. *Textual Commitment to the Political Branches*

"The dominant consideration in any political question inquiry is whether there is a 'textually demonstrable constitutional commitment of the issue to a coordinate political department.'" *Saldano v. O'Connell*, 322 F.3d 365, 369 (5th Cir. 2003) (quoting *Baker*, 369 U.S. at 217). Appellants contend that this

litigation does not involve a textual commitment to another branch, as the complaints merely require the court to interpret domestic antitrust law and apply it to conduct within the United States having only tangential effects on foreign affairs. In contrast, Appellees characterize the pleadings as seeking to condemn the actions of foreign sovereigns and interfere with the longstanding foreign policy of the political branches. Appellees point to several constitutional clauses as evidence that foreign policy is exclusively reserved to the political branches. In particular, they cite Article I, section 8, clause 3 ("The Congress shall have the Power . . . To regulate Commerce with foreign Nations . . . ."); Article II, section 2, clause 1 ("The President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States . . . ."); Article II, section 2, clause 2 ("[The President] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; and he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors [and] other public Ministers and Consuls . . . ."); and Article II, section 3 ("[The President] shall . . . receive Ambassadors and other public Ministers . . . .").

In general, "matters relating 'to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" *Haig v. Agee*, 453 U.S. 280, 292 (1981) (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952)). "[T]he conduct of foreign relations is committed by the Constitution to the political departments of the Federal Government; . . . the propriety of the exercise of that power is not open to judicial inquiry." *United States v. Pink*, 315 U.S. 203, 222–23 (1942). This court has consistently "followed the command that matters implicating foreign relations and military affairs are generally beyond the authority or competency of a court's adjudicative powers." *Lane*, 529 F.3d at 559 (citing *Farmer v. Mabus*, 940 F.2d 921, 923 (5th Cir. 1991); *Occidental of Umm*

No. 09-20084

*al Qaywayn, Inc. v. A Certain Cargo of Petroleum*, 577 F.2d 1196, 1203 (5th Cir. 1978)).

However, "it cannot of course be thought that 'every case or controversy which touches foreign relations lies beyond judicial cognizance.'" *Banco National de Cuba v. Sabbatino*, 376 U.S. 398, 423 (1964) (quoting *Baker*, 369 U.S. at 211). A general invocation of "foreign policy," without more, will not suffice. For example, in *Japan Whaling*, the Supreme Court held that a political question was not raised by a claim that asked the Court to "command the Secretary of Commerce . . . to dishonor and repudiate an international agreement" regarding limits on commercial whaling. 478 U.S. at 229. The *Japan Whaling* Court proceeded to examine the merits of the claim in spite of the case's "significant political overtones," noting that the interpretation of treaties and executive agreements is "a recurring and accepted task for the federal courts." *Id.* at 230.

Unlike *Japan Whaling*, the case at bar does not present "a purely legal question of statutory interpretation." *Id.* Adjudication of the claims before us would require that we review the considered foreign policy of the political branches, which—in contrast to those branches' chosen policy regarding the whaling quotas at issue in *Japan Whaling*—is not codified in a treaty that we are merely asked to interpret. Moreover, in *Japan Whaling*, the Court was asked to compel U.S. officials to act according to the law, whereas in the instant matter, we are asked essentially to reprimand foreign nations and command them to dismantle their international agreements. Nor are we presented with a case in which a political question holding would require our predicate acceptance of an Executive Branch legal interpretation, such as (for example) the "premise that *de jure* sovereignty is the touchstone of habeas corpus jurisdiction." *Boumediene v. Bush*, 553 U.S. 723, 755 (2008).

Appellants have alleged a price-fixing conspiracy involving OPEC member nations. We must "analyze [this] claim as it would be tried," *Occidental of Umm*,

17

577 F.2d at 1202, and as we have already observed, a trial on Appellants' conspiracy claims requires an inquiry into whether Appellees entered into an agreement with OPEC member nations to fix prices. A pronouncement either way on the legality of other sovereigns' actions falls within the realm of delicate foreign policy questions committed to the political branches. By adjudicating this case, the panel would be reexamining critical foreign policy decisions, including the Executive Branch's longstanding approach of managing relations with foreign oil-producing states through diplomacy rather than private litigation, as discussed in the government's amicus brief and in several official statements of administration policy.[13]  In accordance with this policy, the Department of Justice has, upon thorough consideration, declined to bring a Sherman Act case on behalf of the United States. Any merits ruling in this case, whether it vindicates or condemns the acts of OPEC member nations, would reflect a value judgment on their decisions and actions—a diplomatic determination textually committed to the political branches.

As the Departments of State, Treasury, Energy, and Justice emphasize in their brief supporting affirmance,[14] adjudication of this case would result in the frustration of various objectives "of vital interest to the United States' national

---

[13] *See, e.g.*, OFFICE OF MGMT. & BUDGET, EXECUTIVE OFFICE OF THE PRESIDENT, STATEMENT OF ADMINISTRATION POLICY: H.R. 2264—NO OIL PRODUCING AND EXPORTING CARTELS ACT OF 2007 (NOPEC) (May 22, 2007) ("[T]he Administration believes that the appropriate means for achieving [the nation's] objective[s involving international energy markets] lies in diplomatic efforts by the United States with the countries involved in [the energy] trade, rather than lawsuits against those countries in U.S. courts.").

[14] As this case implicates complex and delicate issues of separation of powers and foreign policy, we requested a Statement of Interest from the United States under 28 U.S.C. § 517.  Courts have found Statements of Interest to be useful where cases involve questions of foreign relations. *See, e.g.*, *Spacil v. Crowe*, 489 F.2d 614, 617 (5th Cir. 1974) (deferring to Executive's determination that sovereign immunity should be afforded); *Occidental of Umm*, 577 F.2d at 1204 (finding convincing a statement from the State Department that the political question doctrine precluded resolution).  While a Statement of Interest does not bind us, we must "give serious weight to the Executive Branch's view of the case's impact on foreign policy." *Sosa v. Alvarez–Machain*, 542 U.S. 692, 733 n.21 (2004).

security." The government's brief underscores that the damaging consequences of this litigation are likely to include immediate disruption of oil imports into the United States, the undermining of relationships with OPEC nations on issues such as counterterrorism and nuclear non-proliferation, the undermining of relationships with non-OPEC nations that have a stake in the questions presented here, and the frustration of other national priorities, including foreign investment in the United States by nations such as Saudi Arabia. *Cf. Haig*, 453 U.S. at 307 ("[F]oreign policy and national security considerations cannot neatly be compartmentalized."). As the briefing before us makes clear, access to petroleum products is essential to, among other concerns, our military and national defense infrastructure. A merits ruling in this case has the potential to interfere with our military's ability to access the requisite amounts of petroleum for ongoing military engagements and our national defense generally. Control over such vital military supplies is textually committed to the political branches. *See Gilligan v. Morgan*, 413 U.S. 1, 10 (1973) ("The ultimate responsibility" for decisions as to, *inter alia*, "equipping[] and control of a military force" "is appropriately vested in branches of the government which are periodically subject to electoral accountability."); U.S. Const. art. II, § 2, cl. 1.

For the foregoing reasons, we are persuaded that the foreign policy issues at stake in this case are textually committed to the political branches.

### 2. *Judicially Manageable Standards*

We next consider whether there is "a lack of judicially discoverable and manageable standards for resolving" the claims presented. *Baker*, 369 U.S. at 217. This concept "is not completely separate from" the concept of a textual commitment to the coordinate branches. *Nixon v. United States*, 506 U.S. 224, 228 (1993). However, a court may examine the merits of a case that touches on foreign policy in some instances, such as where a statutory scheme exists to guide the court's determination of an issue. *See, e.g.*, *Japan Whaling*, 478 U.S.

at 230 (finding that judicially manageable standards exist, and case is justiciable, where "decision . . . calls for applying no more than the traditional rules of statutory construction, and then applying this analysis to the particular set of facts presented below"). In contrast, where there is an "utter absence of statutory, administrative or case law" available to guide our decision, we disfavor resolution on the merits. *Lane*, 529 F.3d at 562.

We are persuaded that deciding the merits of the instant case would require a court to recast what are foreign policy and national security questions of great import in antitrust law terms. We hardly need to pierce the pleadings before us to understand that Appellants seek nothing short of the dismantling of OPEC and the inception of a global market that operates in the absence of agreements between sovereigns as to the supply of a key natural resource. The Sherman and Clayton Acts are decidedly inadequate to provide judicially manageable standards for resolving such momentous foreign policy questions. Indeed, "[i]t has never been supposed that there are any judicially manageable standards for reviewing the conduct of our nation's foreign relations by the other two branches of the federal government." *Trujillo–Hernandez v. Farrell*, 503 F.2d 954, 954 (5th Cir. 1974) (per curiam) (citing *Harisiades*, 342 U.S. 580, *Pink*, 315 U.S. 203, and *Oetjen v. Central Leather Co.*, 246 U.S. 297 (1918)). We agree with those courts that have held that merely "recasting foreign policy and national security questions in tort terms does not provide standards for making or reviewing foreign policy judgments." *Schneider*, 412 F.3d at 197. *See also Aktepe v. United States*, 105 F.3d 1400, 1404 (11th Cir. 1997) ("The interjection of tort law into the realms of foreign policy and military affairs would effectively permit judicial reappraisal of judgments the Constitution has committed to the other branches."). The same reasoning holds true when parties couch the conduct of foreign relations and national security policy in antitrust terms while essentially asking us to make a pronouncement on the resource-exploitation

No. 09-20084

decisions of foreign sovereigns that control the global supply of oil, a natural resource vital to the economic and national security of this country.

### 3. *Prudential Considerations*

The remaining four *Baker* factors—the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; the impossibility of a court's undertaking independent resolution without expressing lack of the respect owing to the coordinate branches of government; an unusual need for unquestioning adherence to a political decision already made; and the potential of embarrassment from multifarious pronouncements by various departments on one question—also weigh against an adjudication of this case on the merits.

Deeply rooted constitutional "[s]eparation-of-powers principles impel a reluctance in the judiciary to interfere with or embarrass the executive in its constitutional role as the nation's primary organ of international policy." *Spacil v. Crowe*, 489 F.2d 614, 619 (5th Cir. 1974). As we have already outlined and as the government has emphasized to us in its briefing, "the United States, for more than the last 35 years and through decisions made at the highest levels of the Executive Branch[,] . . . has charted a consistent course of managing the complex U.S. relationships with foreign oil-producing states upon which this country still depends for its domestic energy needs, rather than resorting to the far blunter instrument of antitrust litigation against them." Any ruling on the merits of the instant case would by its very nature involve a policy determination at odds with this longstanding policy of diplomatic engagement, expressing a lack of the respect owed to the Executive Branch, which is constitutionally responsible for the conduct of foreign affairs. This would inevitably result in embarrassment from the Judicial Branch's conflicting pronouncement about the United States' mode of engagement with foreign nations that control a critical resource on which this country depends. Such

profound foreign policy questions "uniquely demand a single-voiced statement of the Government's views." *Baker*, 369 U.S. at 211. We are thus presented with an unusual need for adherence to the political decision already made.[15]

As the foregoing discussion makes clear, each one of the *Baker* factors counsels declining to adjudicate the merits of Appellants' complaints. Under the "case and controversy" requirement of Article III, we hold that federal courts lack subject matter jurisdiction over this nonjusticiable political question.

## C.

Although our holding rests on a lack of subject matter jurisdiction, the district court and the parties have devoted considerable attention to the act of state doctrine. Indeed, many of these arguments coincide with those that have animated our decision on political question grounds. For reasons similar to those on which we have relied above, we hold alternatively that, under the act of state doctrine, Appellants have failed to state a claim on which relief can be granted.

Under the act of state doctrine, "the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory." *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897). The doctrine is

---

[15] Moreover, although there has been some debate within Congress about how best to approach OPEC, there is an apparent political consensus that private litigation is to be avoided. Proposed legislation, entitled the No Oil Producing and Exporting Cartels Act (NOPEC), has been introduced before both houses of Congress on numerous occasions since 2000, and versions passed the House of Representatives in 2007 and 2008. The most recent version of the bill proposes to amend the Sherman Act by making it illegal for foreign states and their instrumentalities to conspire to limit oil production or distribution, to fix oil prices, or to restrain the oil trade in any way. *See* NOPEC Act of 2009, S. 204, 111th Cong. (2009). However, NOPEC excludes a private right of action, and "leaves the decision to prosecute OPEC members in the hands of the executive branch by giving the Justice Department sole authority to prosecute." 155 Cong. Rec. S300-04 (2009) (statement of Sen. Arlen Specter). This simply reinforces our conclusion that there is an unusual need for unquestioning adherence to the political decision made by the branches accountable to the electorate: Relations with OPEC nations regarding U.S. oil supplies are not to be conducted through private litigation.

grounded in the principle that "juridical review of acts of state of a foreign power could embarrass the conduct of foreign relations by the political branches of the government." *First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 765 (1972). The doctrine thus overlaps in many respects with the political question doctrine, as it is rooted in constitutional separation-of-powers concerns. *See Banco National de Cuba v. Sabbatino*, 376 U.S. 398, 425 (1964). It recognizes "'the thoroughly sound principle that on occasion individual litigants may have to forgo decision on the merits of their claims because the involvement of the courts in such a decision might frustrate the conduct of [United States] foreign policy.'" *Callejo v. Bancomer*, 764 F.2d 1101, 1113 (5th Cir. 1985) (quoting *First Nat'l City Bank*, 406 U.S. at 769).

"For act of state (as opposed to sovereign immunity) purposes, the relevant acts are not merely those of the named defendants, but *any* governmental acts whose validity would be called into question by adjudication of the suit." *Callejo*, 764 F.2d at 1115, 1116 (emphasis added). The burden lies on the proponent of the doctrine to establish the factual predicate for the doctrine's application. *See Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 694 (1976).

As we have already discussed, Appellees have met their burden of demonstrating that adjudication of this suit would necessarily call into question the acts of foreign governments with respect to exploitation of their natural resources. The Supreme Court has held, albeit in a different factual context, that exploitation of natural resources is an inherently sovereign function. *See United States v. California*, 332 U.S. 19, 38–39 (1947) (allocating the power to drill for oil in the three miles of water off the California coast to the United States instead of California). Indeed, our precedents indicate as much. *See United States v. Mitchell*, 553 F.2d 996, 1002 (5th Cir. 1977) (noting generally "the control that a sovereign such as the United States has over the resources

within its territory.  It can exploit them or preserve them or establish a balance between exploitation and preservation.").[16]

In considering whether a merits review would require us to sit in judgment of the acts of foreign sovereigns in their own territories, we find instructive the reasoning of the Ninth Circuit in a similar case.  *See Int'l Ass'n of Machinists & Aerospace Workers v. OPEC ("IAM")*, 649 F.2d 1354 (9th Cir. 1981).  In *IAM*, a labor union brought Sherman Act claims against OPEC and its member nations. *Id*. at 1355.  The Ninth Circuit relied on the act of state doctrine in declining to address the merits, explaining that "the availability of oil has become a significant factor in international relations," and illustrating other courts' recognition of the "growing world energy crisis."   649 F.2d at 1360 (citing *Occidental of Umm*, 577 F.2d 1196; *Hunt v. Mobil Oil Corp*., 550 F.2d 68 (2d Cir. 1977)).  The court noted that "the United States has a grave interest in the petro-politics of the Middle East[ and] that the foreign policy arms of the executive and legislative branches are intimately involved in this sensitive area." *Id*. at 1361. "While the case is formulated as an anti-trust action, the granting of any relief would in effect amount to an order from a domestic court instructing

---

[16] We note that a "commercial activity" exception to this sovereign activity may obtain with respect to application of the FSIA when, for example, a foreign sovereign enters into "a joint venture contract with oil companies for the exploration, production, and sale on the world market of oil and gas," thus acting "not as a regulator of a market, but in the manner of a private player within it." *Connecticut Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 264 (5th Cir. 2002) (internal quotation marks and citations omitted).  However, we agree with the Ninth Circuit that, under current precedents, "[t]he act of state doctrine is not diluted by the commercial activity exception which limits the doctrine of sovereign immunity." *Int'l Ass'n of Machinists & Aerospace Workers v. OPEC*, 649 F.2d 1354, 1360 (9th Cir. 1981) (noting that the two doctrines "address different concerns and apply in different circumstances").  Neither the Supreme Court nor any circuit have adopted a commercial activity exception to the act of state doctrine, and we decline to do so today.

No. 09-20084

a foreign sovereign to alter its chosen means of allocating and profiting from its own valuable natural resources." *Id.*[17]

The claims before us present a similar scenario. The granting of any relief to Appellants would effectively order foreign governments to dismantle their chosen means of exploiting the valuable natural resources within their sovereign territories.[18] Recognizing that the judiciary is neither competent nor authorized to frustrate the longstanding foreign policy of the political branches by wading so brazenly into the sphere of foreign relations, we decline to sit in judgment of the acts of the foreign states that comprise OPEC.

## III.

We sum up: Appellants, retailers of gasoline products in the United States, have asked the federal courts to adjudicate the merits of their antitrust claims against oil production companies that have allegedly participated in a conspiracy to fix prices. Reducing their claims to basics, Appellants allege a conspiracy that is orchestrated by the sovereign member nations of OPEC. We hold today that Article III courts lack subject matter jurisdiction over Appellants' claims because

---

[17] The *IAM* court also recognized that, "should the court hold that OPEC's actions are legal, this 'would greatly strengthen the bargaining hand' of the OPEC nations in the event that Congress or the executive chooses to condemn OPEC's actions." *Id.* (quoting *Sabbatino*, 376 U.S. at 432). Concluding that "[t]he courts should not enter at the will of litigants into a delicate area of foreign policy which the executive and legislative branches have chosen to approach with restraint," the Ninth Circuit held that the act of state doctrine applied. *Id.*

[18] We recognize the existence of a territorial limitation to the act of state doctrine. *See Maltina Corp. v. Cawy Bottling Co.*, 462 F.2d 1021, 1027 (5th Cir. 1972) (explaining that the relevant acts of the foreign sovereign must be "able to come to complete fruition within the dominion of the [foreign] government"). However, the antitrust claims before us go to price-fixing through agreements about supply—that is, the amount of oil foreign governments extract from their territories. Given our characterization of both complaints as challenging the crude-oil production decisions of foreign sovereigns, the relevant acts are necessarily intraterritorial. One country has no control or sovereignty over the natural resources of another country; a country's decisions about how much of its oil to extract take place exclusively within that country. Appellants have thus failed to allege actions taking place within the United States that stand independent from the alleged production conspiracy.

No. 09-20084

they present nonjusticiable political questions that are constitutionally committed to the political branches responsible for the conduct of United States foreign relations and national security policy. Any ruling on the merits of this case would, by its core essence, impermissibly interfere with the Executive Branch's longstanding policy of engaging with OPEC nations regarding the global supply of oil through diplomacy instead of private litigation. The constitutional concerns that inform our declination of jurisdiction under the political question doctrine similarly persuade us that adjudication of Appellants' claims is precluded by the act of state doctrine. For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED.