GREGG COSTA, Circuit Judge,
concurring in part and dissenting in part:
The Iraq War was the most significant American military engagement since Vietnam. As the United States began to reduce its presence in Iraq, plans were made to turn over security responsibilities to the Iraqis. This lawsuit, though at first glance just a commercial dispute over a dining facility that Kuwait Pearls built in Iraq, asks the judiciary to second guess a sensitive foreign policy determination made during that transition.
*186 As part of the transition process, the United States and Iraq entered into a Security Agreement in 2009. The Security Agreement addresses, among other things, American support in carrying out military operations, control over Iraqi airspace and communication channels, and Iraqi jurisdiction over American military and civilian personnel. The Iraqis also needed access to military bases, so the Security Agreement provides that “Iraq owns all buildings, non-reloeatable structures, and assemblies connected to the soil that exist on agreed facilities and areas, including those that are used, constructed, altered, or improved by the United States Forces.”
In 2011, at the height of the withdrawal, a contracting officer determined that the facility Kuwait Pearls had built at Forward Operating Base Warrior should be handed over to Iraq under the Security Agreement. In making that decision the officer relied not just on the Security Agreement itself, but a 2009 memorandum and “policy guidance” interpreting the Security Agreement from the then-Commanding General of the Multi-National Force in Iraq. That memo begins by explaining that “[a]n effective transfer of functional facilities is critical to enabling our Iraqi partners to assume increased security responsibility” and thus there was a need for the attached “policy providing] detailed guidance for commanders across [ ] Iraq on the process and requirements for closing and returning bases to [Iraq]”.
How do we know that the contracting officer who decided the fate of the dining facility relied on that guidance from the general? She says so in the declaration she submitted in this lawsuit. Evidence contemporaneous to the 2011 decision supports that testimony. The memo notifying KBR that the facility belongs to Iraq reached that determination because the structure was deemed to be “real property,” a term mentioned nowhere in the Security Agreement but defined in the general’s policy guidance. An email from a different contracting official to KBR a couple weeks before that official decision explains that under “GEN Odierno’s memo, if a building is deemed real property[,] it stays to be turned oyer to the Government of Iraq.”
If Kuwait Pearls’ lawsuit accepted the legitimacy of the military’s decision and just were asking the courts to determine if any legal consequences flowed from it, there would be no problem. As best as can be determined at this early stage of the litigation, that may be the case for some of its liability theories. See McMahon v. Presidential Airways, Inc., 502 F.3d 1331, 1362 (11th Cir. 2007) (allowing suit to proceed because it was not evident, at the present stage of the litigation, that plaintiffs tort claims would call into question military decisions). Resolving the allegation that KBR misled Kuwait Pearls back in 2010 when it entered into a subcontract because it already knew the military would turn the property over to Iraq would not require the court to reassess the propriety of the military’s decision. Nor would deciding Kuwait Pearls’ allegation that KBR had a contractual obligation to purchase the facility,[1] in which case KBR would be the victim of the military’s decision to give Iraq the facility. Limited to such allegations that do not ask for reconsideration of the military’s interpretation of the Security Agreement, I agree with the majority opinion that the political question doctrine is not a bar.[2]
*187 Although some language in the majority opinion suggests such a limitation on remand, it allows the full case to go forward. And make no mistake about it. Part of this lawsuit — indeed the crux of it — is asking the federal courts to second guess the military’s decision to give the property to Iraq. In assessing whether lawsuits might require the courts to weigh in on questions reserved for the political branches, we are instructed to envision how the lawsuit will play out. Lane v. Halliburton, 529 F.3d 548, 565 (5th Cir. 2008). That guesswork is not necessary here.[3] Kuwait Pearls told the district court that “the only question [it] must answer is if the Security Agreement covers [Kuwait Pearl’s] facility.” It tells us that the “reality of this case is simple: FOB Warrior (C7) was not a part of the Security Agreement.” Kuwait Pearls Br. at 16; see also id. (“[T]he only question the Court may answer is if the Security Agreement covers KPCC’s Facility. By [its] express terms, it does not.”). There is a lot more to that effect. The district court explained that Kuwait Pearls challenged the military’s decision on the grounds that (1) the “Security Agreement does not reference FOB Warrior (C7) nor list it as an ‘agreed facility’ ” and' (2) the Security Agreement could not apply to the dining facility because the subcontract between KBR and Kuwait Pearls postdated the countries’ agreement.
Kuwait Pearls should not be allowed to avoid the litigation choices it made from the beginning and recast its case on appeal to avoid the defect the district court found.[4] For some of its allegations, no re-characterization can avoid the district court having to decide whether the facility should have been given to Iraq. Consider Kuwait Pearls’ claim seeking only payments for the months KBR allegedly kept using the facility after the military turned it over to Iraq (as opposed to the more significant remedy it seeks of requiring KBR to pay for the entire facility). It relies on the premise that Kuwait Pearls still owns the facility; a premise that requires the court to disregard or reject the military’s determination that the facility belongs to Iraq.
Courts should not be reexamining that decision made in the midst of the withdrawal. The Constitution vests in the Executive Branch the authority to enter into and enforce agreements with other countries. See Saldano v. O’Connell, 322 F.3d 365, 369 (5th Cir. 2003) (“The dominant consideration in any political question inquiry is whether there is a ‘textually demonstrable constitutional commitment of the issue to a coordinate political department.’ ” (quoting Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962))); Kwan v. United States, 272 F.3d 1360, 1364 (Fed. Cir. 2001) (finding nonjus-ticiable a suit demanding compliance with an executive agreement because compliance is a matter of foreign relations); Goldwater v. Carter, 444 U.S. 996, 1003-04, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979) (plurality) (rejecting a challenge to the president’s rescission of a treaty as not justiciable). *188 This textual commitment is at its peak when that authority is exercised in the context of a sensitive military situation like the withdrawal from Iraq, when the United States had an interest in a smooth transition and promoting goodwill with the local forces trying to carry on our country’s mission. Cf. Johnson v. Eisentrager, 339 U.S. 763, 789, 70 S.Ct. 936, 94 L.Ed. 1255 (1950) (stating that the judiciary ought not “entertain private litigation ... which challenges the legality, the wisdom, or the propriety of’ Executive decisions concerning direction of our armed forces).
To the extent Kuwait Pearls is correct that the military’s decision was not consistent with the language of the Security Agreement, that would only reinforce the nonjusticiability of this question as a loose reading of the agreement in favor of the Iraqis may have been more of a matter of comity or strategy than legal reasoning. See Dickson v. Ford, 521 F.2d 234, 236 (5th Cir. 1975) (dismissing as not justicia-ble suit against the United States challenging its decision to provide foreign economic aid to Israel; a decision which both the Executive and the Legislative thought “necessary at this time to maintain a balance of forces in the Middle East” (internal quotation omitted)).
Judicial consideration of the question Kuwait Pearls asks the court to decide— whether the military was wrong in determining the facility should be given to Iraq — would also show a lack of respect for the military decisionmakers and the difficult environment in which they reached their decision. See Baker, 369 U.S. at 217, 82 S.Ct. 691 (stating that a political question is present when it is impossible for a court to undertake independent resolution without expressing lack of the respect due coordinate branches of government); Whiteman v. Dorotheum GmbH & Co. KG, 431 F.3d 57, 73-74 (2d Cir. 2005) (concluding that the fourth Baker test prohibited resolving a property dispute because doing so would undermine the foreign policy advanced by an executive agreement); Aktepe v. United States, 105 F.3d 1400, 1404 (11th Cir. 1997) (holding that assessment of decisions regarding military operations would show a lack of respect for the Executive).
And a contrary decision from the court would prove embarrassing and confusing, casting doubt on the legal title over the facility even though the federal court has no ability to take it away from the Iraqi government. Baker, 369 U.S. at 217, 82 S.Ct. 691 (observing that when there is the potential of embarrassment from multifarious pronouncements by various departments on one question the question is political); Spectrum Stores, Inc. v. Citgo Petroleum Corp., 632 F.3d 938, 953 (5th Cir. 2011) (noting that reaching the merits in an antitrust claim against OPEC would “involve a policy determination at odds with [the United States’] longstanding policy of diplomatic engagement,” which “would inevitably result in embarrassment”).[5]
*189 So what are the reasons the majority opinion nonetheless indicates the political question doctrine is not an obstacle even to those allegations that would require the court to reconsider whether the Security Agreement covered the facility?
It first says that the political question doctrine has never been applied to a contract claim. But the application of Baker has never turned on the type of claim the plaintiff brings; it turns on whether deciding the claim will require the court, to delve into questions committed to another branch. Prior to Spectrum, for example, courts had never applied the doctrine to an antitrust claim. Yet we held that those private claims seeking damages were not justiciable because ruling on the merits would require assessing “matters [which] deeply implicate concerns of foreign and defense policy, concerns that constitutionally belong in the executive and legislative departments.” Spectrum, 632 F.3d at 943. Indeed, courts have found political questions presented by various types of claims, including common law ones. See, e.g., Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum, 577 F.2d 1196, 1202 (5th Cir. 1978) (tortious conversion); Whiteman, 431 F.3d at 59 (compensation for property deprivations). Whether Kuwait Pearls’ claims require a reassessment of the 2011 decision to give Iraq the dining facility is the operative question, not the label affixed to them.
The majority opinion also points out that making that assessment would neither call into question the Security Agreement itself nor second guess the government’s judgment in entering into it. True, but the political question Kuwait Pearls is asking the court to reassess is the military’s subsequent interpretation of the Security Agreement, a decision that took into account extratextual foreign policy and national security considerations in the form of a general’s “policy guidance.” See Spectrum, 632 F.3d at 951 (“Adjudication of the claims before us would require that we review the considered foreign policy of the political branches, which — in contrast to those branches’ chosen policy regarding the whaling quotas at issue in Japan Whaling — is not codified in a treaty that we are merely asked to interpret.”).
Sensitivity to the plight of Kuwait Pearls is understandable. It spent millions to construct a facility and, with the stroke of the military’s pen, that property was turned over to another country. Justice, however, requires not just a hurt plaintiff, but also holding liable the party responsible for that loss. Imposing liability on KBR would place it in the same situation Kuwait Pearls is now: having paid millions for a facility that, by virtue of a decision made by the Executive Branch that the Constitution lets it decide, it no longer owns.
The appropriate recourse is for Kuwait Pearls to pursue the remedy that the law provides when the government takes property to further its own interests: a takings claim. U.S. Const, amend. Y (“[N]or shall private property be taken for public use, without just compensation.”). Although the outcome of that litigation in the Court of Federal Claims would be uncertain (it always is in litigation), it at least appears that Kuwait Pearls would be able to assert the takings claim as a third-party beneficiary of KBR’s contract with the military. See Global Freight Sys. Co. W.L.L. v. United States, 2016 WL 7488356 (Fed. Cl. Dec. 29, 2016). Importantly, that litigation would not raise doubts about the propriety of the military’s decision; it would consider *190 only whether that decision makes the government liable for just compensation for the property it decided to give to the Iraqis. See Langenegger v. United States, 756 F.2d 1565, 1570 (Fed. Cir. 1985) (holding that a takings suit against the United States for enabling a foreign sovereign’s confiscation of property without paying was justiciable because plaintiff did not ask for a determination that the underlying policy was improper, just that a taking had occurred and money was owed). That is a question a court could and should decide. Whether the military acted unlawfully when it gave Iraq the dining facility at FOB Warrior is not.

. The contract appears to create only an option, not an obligation, for KBR to purchase the facility. The merit of a claim is, however, a separate inquiry from whether it asks the courts to decide a political question.

. I also agree that the act-of-state doctrine does not apply.

. The majority opinion does not conduct that inquiry. It says only that “KBR ... provides no citation to the record or legal authority to support” its contention that Kuwait Pearls’ claims challenge the military’s decision to give the facility to Iraq. Maj. Op. at 181. But as noted below, Kuwait Pearls concedes as much time and again.

.Of course, after a dismissal without prejudice for lack of jurisdiction like the one here, a party may refile on different grounds if still within the limitations period. But that is much different from essentially commencing a new suit at the appellate stage.

. The majority opinion devotes a lot of attention to the second Baker factor: judicially manageable standards. It’s a close call whether such standards exist that would allow a court to determine if the facility should have been turned over to Iraq. The question involves more than just the routine judicial task of interpreting contractual language such as that found in the Security Agreement. The contracting officer also relied on policy guid-anee a general issued. Courts have enough trouble figuring out what deference is owed to such informal guidance when offered by government officials handling civilian affairs. See, e.g., United States v. Mead Corp., 533 U.S. 218, 239, 250, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (Scalia, J., dissenting). What deference is owed to a general issuing such guidance in the middle of a war zone? But even if the majority opinion is correct that courts are *189 equipped to reevaluate the turnover decision, the presence of any of the six Baker factors— and three are discussed above including the most important first factor — renders a question political and prevents us from deciding it.