# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-20270

United States Court of Appeals
Fifth Circuit

**FILED**

March 27, 2017

Lyle W. Cayce
Clerk

KUWAIT PEARLS CATERING COMPANY, WLL

Plaintiff – Appellant

v.

KELLOGG BROWN & ROOT SERVICES, INCORPORATED,

Defendant – Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before JONES, BARKSDALE, and COSTA, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

Primarily at issue in this appeal by Kuwait Pearls Catering Co., WLL (KPCC), from its action's being dismissed is whether the political-question doctrine renders nonjusticiable a contract dispute between Kellogg Brown & Root Svc., Inc. (KBR), a general contractor supporting the Government's military operations in Iraq, and KPCC, one of its subcontractors. At issue is the 2010 contract for, *inter alia*, KBR's leasing, with an option to purchase, a dining facility (the facility) constructed by KPCC in Iraq. In 2011, KBR informed KPCC the Government deemed the facility was property belonging to the government of Iraq, under a 2008 security agreement between the two

No. 16-20270

governments.  KPCC alleges KBR continued using the facility for another year, without paying rent or purchasing it.  This action requires construing a contract and determining whether it was, *inter alia*, breached; there is, *inter alia*, no nonjusticiable political question.  VACATED and REMANDED.

I.

The United States' military began operations in Afghanistan shortly after the 11 September 2001 al Qaeda attacks in the United States.  To assist, in part, with those operations, the Government issued contracts through its logistical-civil-augmentation program (LOGCAP III) to private entities, including its 14 December 2001 contract with KBR.  Under KBR's LOGCAP III contract, the Army issued orders for services, primarily on a cost-reimbursement basis.

Prior to the United States' invasion of Iraq in 2003, the Government began issuing orders to KBR to perform support services for the mission there, including base-life services (BLS) for forward-operating bases (FOBs).  KBR was contracted to provide, *inter alia*, food services for dining facilities at various FOBs in Iraq.  KBR's BLS contracts allowed it to subcontract services.

In that regard, KBR contracted in 2007 with KPCC for it to administer food services at FOB Warrior (7) in Kirkuk, Iraq.  The complaint alleges: KPCC constructed a "removable" facility after KBR's 2006 request; and, in 2007, KBR began using the facility under the contract.  After the contract between KBR and KPCC expired, a new one was entered in September 2010.  This second contract (the contract) is at issue.

Under the contract, KBR continued leasing the facility and equipment necessary to operate it.  KBR also held the option, for leased assets, "at its sole discretion at any time during the lease, [to] unilaterally opt to purchase the Assets".  If KBR exercised its option, "title to the asset passe[d] to [KBR] upon

full payment of the Purchase Price minus lease payments". The facility, according to KPCC's briefing—but without citation to the record—was a "temporary structure that could be assembled and disassembled as needed". Moreover, citing provisions of the contract, KPCC asserts the contract provided for it to deconstruct and remove, *inter alia*, the facility if KBR did not exercise its purchase option.

The complaint alleges the following occurred through the end of 2011. In 2010, after the contract was in effect, KBR initiated negotiations with KPCC to purchase the facility, but these talks fell through. By April 2011, however, KPCC was informed by KBR of its intention to formally re-open the purchase-discussion. This second round of negotiations continued as late as July 2011. Again, no agreement was reached. That November, KBR provided formal notice to KPCC, not only that the Government no longer wished to purchase the facility, but also that this decision was based on the Government's determination the facility was "real property", and, accordingly, was the property of the Iraqi government pursuant to a security agreement between the two governments.

The security agreement, executed 17 November 2008, took effect 1 January 2009, and governed the terms of the United States' military withdrawal from Iraq, and the transition to future security arrangements. Article five of the security agreement settled the ownership of certain property as between the two governments: "Iraq owns all buildings, non-relocatable structures, as well as assemblies connected to the soil that exist on *agreed facilities and areas*, including those that are used, constructed, altered, or improved by the United States Forces". (Emphasis added.) As provided in the security agreement, the "agreed facilities" to be returned to Iraq would be "based on two lists": one was to take effect upon entry of the security

agreement; the second, no later than 30 June 2009.  These two lists, however, are not part of the record; and, at oral argument here, the parties represented the lists have never been located.

KBR asserts it first became aware of the Government's position regarding the security agreement's application to the facility in an October 2011 email to KBR from the deputy program director for LOGCAP.  (The email is an exhibit to KBR's motion to dismiss.)  Through email correspondence with the Government, KBR initially pushed back against the Government's position, and advised the reclassification could result in a breach of the contract and liability in excess of the purchase price.  Ultimately, however, the Government maintained its position, and KBR gave formal notice to KPCC.

The complaint alleges:  KPCC was required by KBR to vacate the facility in February 2012, without being allowed to remove the structure; and KBR continued using the facility through 2013, while not making lease payments to KPCC during that time period and denying its claim for reimbursement of the cost of building the facility.

After KPCC filed this action in Texas state court, KBR removed to district court, and KPCC filed its first amended complaint, subject to its motion to remand.  In that complaint, KPCC presented the following three claims: breach of contract; fraud; and promissory estoppel.

In support of the breach-of-contract claim, the complaint provides: KPCC "entered into a valid and binding agreement" with KBR; it breached the contract when it "exercised its option to purchase the . . . facility"; and it "refused and continues to refuse to pay for the . . . facility", despite "continu[ing] to utilize the facility and refus[ing] to allow KPCC to take the facility and its equipment back to Kuwait".  The complaint maintains KPCC

4

suffered damages "[a]s a result" of this claimed breach, as well as "because KBR unlawfully took the building and continued to use it".

With regard to fraud, the complaint states:  KBR's representation in 2011 that "it would exercise the option to purchase the building" under the contract "was material and false"; KBR "made the representation at a time it knew the representation was false or . . . recklessly as a positive assertion without knowledge of its truth . . . with the intent KPCC would act upon it"; and, in reliance on KBR's representation, KPCC negotiated for the sale of the facility, "instead of preparing to demobilize the facility in advance of the end of the contract".  Additionally, the complaint maintains:  "KBR's continued reliance on [the security agreement] means that in 2010 [when the contract with KPCC was entered] its promises to purchase the [f]acility were false and/or made with reckless disregard for the truth".  The complaint claims KPCC suffered damages as a result of its reliance on KBR's fraudulent representations.

For the promissory-estoppel claim, the complaint provides:  if the facility is subject to the security agreement, it became the property of Iraq in June 2009, and, therefore, the contract "fails for lack of mutuality"; and "KPCC relied on KBR's promises to lease and purchase the [f]acility to its detriment . . . [because] KPCC could have removed the facility in 2010, or earlier".

KBR moved to dismiss on numerous grounds, including nonjusticiability pursuant to the political-question doctrine articulated in *Baker v. Carr*, 369 U.S. 186 (1962), and the related act-of-state doctrine.  It also asserted derivative immunity under *Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18 (1940).

No. 16-20270

In a very detailed and comprehensive opinion, the district court denied remand and granted KBR's motion to dismiss. *Kuwait Pearls Catering Co., WLL v. Kellogg Brown & Root Svcs., Inc.*, No. 4:15-cv-754, 2016 WL 1259518, at \*14, \*22 (S.D. Tex. 31 Mar. 2016). The court stated in *dicta*: "[T]he government contract defense, the political question doctrine . . . and the act of state doctrine all apply under the facts here to preclude the [c]ourt from ruling on the issues in this case". *Id.* at \*22. Ultimately, however, the court based its decision on "only the political question doctrine, in which the act of state doctrine is grounded[,] . . . [and which] deprives the [c]ourt of subject matter jurisdiction so as to trigger application of [Federal Rule of Civil Procedure] 12(b)(1)". *Id.* Accordingly, the court dismissed the complaint, without prejudice, "based on the political question and act of state doctrines". *Id.*

II.

KPCC challenges only the dismissal; in other words, the remand-denial is not contested. As for the dismissal, KPCC presents two challenges: its claims do not involve a nonjusticiable political question; and the act-of-state doctrine does not apply. It maintains, additionally, KBR is not entitled to derivative sovereign immunity. Although KBR abandons the act-of-state doctrine as a basis for affirmance, it counters that a nonjusticiable political question is involved, and that derivative immunity presents an alternative basis for affirmance.

A Rule 12(b)(1) dismissal is reviewed *de novo*, taking the well-pled factual allegations of the complaint as true, viewed in the light most favorable to plaintiff. *E.g.*, *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008). The district court's factual findings are reviewed for clear error; its conclusions of law, *de novo*. *Id.* KPCC, as the party asserting jurisdiction, bears the burden

6

No. 16-20270

of establishing it. *E.g.*, *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

In considering a Rule 12(b)(1) motion, a court may find a plausible set of facts by considering any of the following: (1) the complaint; (2) the complaint, supplemented by undisputed facts evidenced in the record; or (3) the complaint, supplemented by undisputed facts, plus the court's resolution of disputed facts. *Lane*, 529 F.3d at 557. The third approach is utilized in this instance. In short, "we must determine by viewing the allegations in the most favorable light, whether [KPCC] can prove any plausible set of facts that would permit recovery against KBR without [, *inter alia*,] compelling the court to answer a nonjusticiable political question". *Id.*

### A.

The political-question doctrine forecloses as nonjusticiable actions which would improperly require judicial review of decisions exclusively within the purview of the political branches of government. *See Baker*, 369 U.S. at 210–11. The Court's *Baker* analysis requires a "discriminating inquiry into the precise facts and posture of the particular case", rather than "semantic cataloguing" of issues as implicating "foreign policy" or "national security". *Lane*, 529 F.3d at 558 (quoting *Baker*, 369 U.S. at 216). To that end, the Court prescribed six factors for determining whether a nonjusticiable political question is presented:

> (1) "a textually demonstrable constitutional commitment of the issue to a coordinate political department";
> (2) "a lack of judicially discoverable and manageable standards for resolving it";
> (3) "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion";

7

No. 16-20270

(4)    "the impossibility of a court's undertaking the independent resolution without expressing lack of the respect due coordinate branches of government";

(5)    "an unusual need for unquestioning adherence to a political decision already made";

(6)    "or the potentiality of embarrassment from multifarious pronouncements by various departments on one question".

*Baker*, 369 U.S. at 217.  "[T]he inextricable presence of one or more of these factors will render the case nonjusticiable under the Article III 'case or controversy' requirement".  *Lane*, 529 F.3d at 558 (quoting *Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum*, 577 F.2d 1196, 1203 (5th Cir. 1978)).

Our court "has followed the command that matters implicating foreign relations and military affairs are generally beyond the authority or competency of a court's adjudicative powers".  *Lane*, 529 F.3d at 559 (citing, *e.g.*, *Farmer v. Mabus*, 940 F.2d 921, 923 (5th Cir. 1991); *Occidental*, 577 F.2d at 1203).  Along that line, there have been "sweeping statements to the effect that all questions touching foreign relations are political questions".  *Baker*, 369 U.S. at 211.  But, obviously, "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance".  *Id.*  For example, "courts have the authority to construe treaties and executive agreements, and it goes without saying that interpreting congressional legislation is a recurring and accepted task for the federal courts".  *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986).

In concluding the political-question doctrine forecloses jurisdiction, the court ruled "the issue here implicates the first, second, fourth and sixth factors" provided in *Baker*.  *KPCC*, 2016 WL 1259518, at *13.  (The parties do not urge application of the third and fifth *Baker* factors.  We agree that those two factors

need not be considered.)  As for those four factors, the court determined that "KPCC's claims implicate the first *Baker* factor, a 'textually demonstrable constitutional commitment of the issue to a coordinate political department,' because war and foreign policy decisions are constitutionally committed to the Executive Branch".  *Id*. at *11 n.14.  Accepting KBR's contentions regarding the other factors, the court explained:

> KBR argues that the issue implicates the second factor because there are no judicially manageable standards for resolving on the merits whether the United States military appropriately designated the [facility] as "real property," and thus whether the government's contractual directives to KBR were in error.  The fourth and sixth *Baker* factors would be at issue if, years after the United States withdrew its forces from Iraq, the judiciary disagreed with the terms of the Security Agreement negotiated by the Executive Branch or with how the military applied those terms to [an] American military base in Iraq.

*Id*. at *13.  Because the court concluded that these factors applied and agreed with KBR "that the governmental decision making about the application of the Security Agreement to the [facility] is 'inextricably intertwined with the merits of KPCC's case against KBR'", the court granted dismissal.  *Id*. at *21.

KPCC contends none of the *Baker* factors apply, and frames its contentions in the context of the remedy it seeks—damages.  Citing *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 395 (1971), KPCC asserts: "When a plaintiff seeks only damages, the lawsuit is typically free from any political question".  *See also Koohi v. United States*, 976 F.2d 1328, 1332 (9th Cir. 1992) ("A key element in our conclusion that the plaintiffs' action is justiciable is the fact that the plaintiff seek only damages for their injuries."); *but see Spectrum Stores, Inc. v. Citgo Petrol. Corp.*, 632 F.3d 938, 948 (5th Cir. 2011) (holding antitrust damages action challenging OPEC cartel barred under political-

question doctrine).  Further, it maintains KBR seeks to invoke the political-question doctrine by shifting to the Government responsibility for KBR's decision to breach the contract.

KBR responds that KPCC is calling into question a foreign-policy judgment made by the executive branch, stating "KPCC must still establish its ownership of the . . . facility in order to prevail".  KBR asserts the court analyzed the *Baker* factors properly, and emphasizes the application of the sixth *Baker* factor because "KPCC's claims necessarily second-guess a determination that the Government has already made".

Further, KBR cites the contract as demonstrating the Government's "control over KBR's payment obligations", therefore making KPCC's claims "intertwined with the Government's foreign-policy and military judgment". For example, KBR asserts that, under the contract, it had "no liability for any payments unless the Government elects to provide the requisite funds".  (As KPCC points out, however, the provision cited relates to "funding for the *services* contemplated" by the contract.) (Emphasis added by KPCC.)  KBR states that, although it possessed the option to purchase, it was under no obligation to do so.  Accordingly, it maintains, any consideration of KPCC's claims would require an impermissible judicial review of the Government's policy decision.

Notably, the parties do not cite any authority analyzing, under the political-question doctrine, a breach-of-contract dispute; and KBR conceded at oral argument here it had not found such precedent.  *But see Gross v. German Found. Indus. Init.*, 456 F.3d 363, 391 (3d Cir. 2006) (holding Holocaust-victims' breach-of-contract claims based on Joint Statement of Berlin Accords did not present nonjusticiable political question); *Eckert Int'l, Inc. v. Gov't of the Sovereign Democratic Republic of Fiji*, 834 F. Supp. 167, 173 (E.D. Va.

No. 16-20270

1993) (holding no political question because, *inter alia*, the claim "does not involve conflicts between branches of the government, but rather a commercial contract dispute between a foreign government and a private U.S. company"); *Cont'l Grain Export Corp. v. Ministry of War-Etka Co. Ltd.*, 603 F. Supp. 724, 729 (S.D.N.Y. 1984) (holding no political question to analyze forum-selection clause in contract between U.S. company and Iran).  (The partial dissent at 6 states that the majority "says . . . the political question doctrine has never been applied to a contract claim", and that "the application of *Baker* has never turned on the type of claim".  As demonstrated *infra*, we do not treat this as a *Baker* factor; the absence of such precedent, however, is certainly instructive, and the partial dissent provides no other contract-dispute examples.)

Analyzing this appeal, *de novo*, under the "discriminating inquiry" required by *Baker*, and for the reasons that follow, KPCC's claims do not present a nonjusticiable political question.

1.

KBR contends the first *Baker* factor applies because "decisions involving '[t]he conduct of the foreign relations of our Government [are] committed by the Constitution to the Executive and Legislative . . . Departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision'". (Quoting *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918).)  In that regard, KBR asserts the Government's interpretation of the security agreement is "a quintessential foreign policy decision committed to the Executive Branch . . . solely for the Executive to make".  KPCC responds that it does not challenge the validity of the security agreement or any action taken by the Government; instead, it takes issue only with KBR's actions.

We agree with KPCC. This first factor is directed at actions taken by a coordinate branch of the federal government; and, obviously, "KBR is not part of a coordinate branch of the federal government". *Lane*, 529 F.3d at 560. Accordingly, KBR bears the "double burden" of showing: KPCC's claims will require reexamination of a decision by the Government; and its decision is insulated from judicial review. *Id.*

An October 2011 email from the Government instructed KBR the "purchase is not approved and [the Government had reached] a legal opinion that [KPCC] has no authority to sell since it is real property and technically the Iraqis own all real property in the country". The same email notes a KBR employee "brought up that [KPCC] may have a potential claim; however, that will be between [KPCC] and KBR to make that determination". A declaration by the procuring contracting officer for LOGCAP III states, *inter alia*: she "instructed KBR to direct its subcontractor [KPCC] not to remove or damage the [facility] that was considered real property"; and "[i]t is [her] understanding that KBR complied with these instructions". And, in a November 2011 memorandum, the procuring contracting officer instructed: "Pursuant to the Security Agreement, [KBR] shall direct their subcontractor that it shall not remove or damage [the facility]". This instruction was based on the Government's determination it did "not have the authority to purchase buildings that are considered 'real property' AND [KBR] does not have the authority to sell or remove real property according to [the security agreement]". (The partial dissent at 1 states the procuring contracting officer also "relied" on a 20 April 2009 "policy guidance" memorandum from the American general commanding the multi-national force in Iraq. The 2009 memorandum, however, was not specifically referenced in the procuring contracting officer's declaration (instead, reference was to "MNF-I Policy"), nor was it cited in her

12

November 2011 memorandum. Although the general's 2009 memorandum is cited by KBR on appeal, there does not appear to be any direct evidence that the procuring contracting officer relied on this memorandum, nor does either party make such a representation in their briefing on appeal.)

Although presented with the record of the back-and-forth between KBR and the Government, KPCC's claims for breach of contract, fraud, and promissory estoppel are based on KBR's alleged conduct—the representations it made to KPCC and its reliance on them. KBR's political-question contention hinges on its assertion that "KPCC must . . . establish its ownership of the . . . facility in order to prevail[,] . . . requir[ing] KPCC to challenge the Government's official judgment that the . . . facility is subject to the Security Agreement, even if the validity of the Security Agreement is not disputed". KBR, however, provides no citation to the record or legal authority to support this conclusory assertion.

Assuming, *arguendo*, KPCC could prove KBR made fraudulent representations to induce KPCC into the contract, there would be no need to determine the current owner of the facility. Further, only segments of the contract are in the record on appeal, and it may be the case—and maybe not— that the parties contracted for the highly foreseeable circumstance that property in a war zone could be subject to conflicting ownership claims as a result of the Government's action, preventing any analysis of its conduct. Perhaps KBR will point to the directions it received from the Government as a relevant fact, but at this Rule 12(b)(1) stage, KBR has not met its "double burden" of showing: KPCC's claims will require reexamination of a decision by the Government; and its decision is insulated from judicial review. *Lane*, 529 F.3d at 560. Accordingly, "[v]iewing the facts in a light most favorable to [KPCC, its] claims challenge actions taken and omissions made only by KBR.

No. 16-20270

That company's conduct can be examined by a federal court without violating the Constitution's separation of powers". *Id*.

2.

The second factor—lack of judicially manageable standards—likewise does not apply. We are not presented with the specific elements that must be proved because the issue of which jurisdiction's substantive law controls the outcome is not properly before us. Nonetheless, resolution of this dispute will require only determining whether damages are available because a contract was breached, or because of reliance on fraudulent or otherwise actionable representations.

Courts are well acquainted with the interpretation of written agreements, even in disputes involving the Government and foreign sovereigns. *E.g.*, *Japan Whaling*, 478 U.S. at 230 ("[T]he courts have the authority to construe treaties and executive agreements".); *Gross*, 456 F.3d at 386 (Berlin Accords resolving reparations claims for victims of Nazi regime). Providing services for the benefit of the Government in a combat theater does not alter the point.

That KPCC's claims can be addressed by standard contract analysis is demonstrated by KBR's extensive analysis of, and reliance upon, the contract. Although, as noted, the entirety of the parties' agreement is not part of the record, several sections of the contract plainly bear on the issues raised here. For example, ¶ 2 defines the "scope of work" to include providing "all . . . things necessary to construct or operate a dining facility". Paragraph 3 conditions performance, to some extent, on the availability of funds for, and continuation of, the KBR's agreement with the Government. Paragraph 4.5 describes KBR's unilateral option to lease or purchase assets at a price determined elsewhere in the contract. Additionally, the contract is described

14

at ¶ 4.2 as an "Indefinite Delivery/Indefinite Quantity (ID/IQ) agreement" under which the minimum guaranteed amount is $20,334.02 and the maximum amount payable to KPCC is $7,803,096.84.

KBR cites all but the last of these provisions to refute KPCC's claim "that the [contract] requires KBR to pay for the dining facility anyway". Where, as here, both parties can foot their claims on the contract, the existence of traditional, judicially manageable standards is beyond dispute. *See Japan Whaling*, 478 U.S. at 230 (noting that the necessity of applying "traditional rules" in a case indicates the existence of judicially manageable standards and, thus, a justiciable controversy). The choice of law may affect the outcome, but that issue is not before us and does not detract from our conclusion.

Issues of a different, but equally manageable sort, are presented to the extent that KBR properly calls attention to the fact that the Government may have ordered KPCC to turn over the facility to satisfy the security agreement. If a project owner prevents a contractor from fulfilling its agreement with a subcontractor, ordinary legal principles may afford the subcontractor options like an action for interference or conversion. Here, if the Government essentially conscripted the facility in the service of foreign relations, a court decision in favor of KPCC could require the Government to reimburse KPCC for a "taking" or conversion. KPCC has not pressed such a claim; but, if it did, the resolution of the claim could proceed without a court's second-guessing the discretion exercised by the Executive Branch. In any event, whether the Government's action affects the interpretation of the contract can be decided by the district court under traditional jurisprudential standards.

The partial dissent at 3 warns "the crux of [this action] is asking the federal courts to second guess the military's decision" to transfer ownership of

the facility to Iraq.  This concern appears to stem almost entirely from two quotations drawn from KPCC's briefing:  first, that "the only question [the court] must answer is if the Security Agreement covers [the facility]"; and, second, that the "reality of this case is simple:  [the facility] was not a part of the Security Agreement".  Considering these statements in context, KPCC does not represent its case rests on interpreting whether the security agreement was violated by the Government.  For example, KPCC maintains on appeal:

> This Court will not be questioning a political decision made by another branch of government.  While some of the facts of this case exist as a result of those decisions, the question of this case is if KBR breached its contract with KPCC.  And that is the question that will ultimately be presented to the jury, "Did KBR fail to comply with its contract with KPCC?"  This is how this case will ultimately be tried, and illustrates that no political question is present.

In fleshing out its contentions, KPCC states: "Ultimately, if the United States government had the right to declare that the [f]acility was subject to the Security Agreement, and thus belonged to the government of Iraq, then the contract had a provision for how that was to be handled:  KBR was to pay for it".  In short, KPCC's claims are based solely on its view of the contract, and it has represented to the court it will not be challenging or questioning the Government's conduct.

Citing our court's decision in *Lane*, 529 F.3d at 565, the partial dissent at 3 asserts that "we are instructed to envision how the lawsuit will play out"; and, at 3 n.3, that "[t]he majority opinion does not conduct that inquiry".  As demonstrated, however, we have engaged in this analysis.  Moreover, the claims at issue in *Lane* were far closer to the realm of nonjusticiability than those presented here.  In *Lane*, KBR's stated intent to raise the military's allegedly-inadequate protection as the cause of KBR's civilian convoys' injuries

from insurgent attacks did not remove the civilians' tort claims from justiciability. *Id.* at 567. It was sufficient that "the court may not have to inquire into the adequacy of the Army's intelligence and planning to determine whether, based on the information it possessed, KBR made misrepresentations or breached a duty to its employees". *Id.*

Here, the district court will not be required to determine whether the Government's choice to transfer the facility to Iraq—a far cry from reviewing military tactical decisions regarding security in a war zone—was proper. Nonetheless, perhaps to KBR's benefit, the security agreement and the Government's actions can be considered in ruling on the claims asserted in KPCC's complaint. Regardless of the representations made in its briefing, KPCC will be limited to establishing the viable claims asserted in its complaint; none of the claims requires the court to evaluate the propriety of the Government's conduct.

Therefore, based on the record at this stage, the claims presented require resolution of contractual disputes for which there exist judicially manageable standards.

3.

The overlapping fourth and sixth factors likewise do not apply. The fourth factor weighs "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government"; the sixth, "the potentiality of embarrassment from multifarious pronouncements by various departments on one question". *Baker*, 369 U.S. at 217. In analyzing these factors, courts have weighed the Government's presentation, *vel non*, of a stated position regarding justiciability. *E.g.*, *Whiteman v. Dorotheum GmbH & Co. KG*, 431 F.3d 57, 72 (2d Cir. 2005) (fourth factor implicated by the Government's statement of interest to the

court); *Gross*, 456 F.3d at 390–91 (sixth factor not implicated because the Government "filed no document with a court pointing to its interests or to any foreign-policy positions that would be contradicted").

For this action, the Government has not asserted a position on whether resolution of KPCC's claims should be handled exclusively outside the courts, nor has KBR presented any statement by the Government that the political-question doctrine will be implicated if KPCC's claims go forward.  KBR relies on a declaration from the procuring contracting officer for LOGCAP III who "instructed KBR to direct its subcontractor not to remove or damage the [facility] that was considered real property".  The declaration, however, offers no position by the Government regarding justiciability, *vel non*, of KPCC's claims; and the Government made clear in its correspondence with KBR that it was "between [KPCC] and KBR" to determine whether there was a claim.

Further, even if we were to interpret the security agreement as bearing on KBR's actions vis-à-vis the contract, such an interpretation would neither call into question the security agreement itself, nor "second-guess" the Government's judgment in entering it.  Indeed, presumably the Government entered a written agreement in anticipation of future disputes of its meaning. For example, article 21 for claims under the security agreement states:  "*With the exception of claims arising from contracts*, each Party shall waive the right to claim compensation against the other Party for any damage, loss, or destruction of property, or compensation for injuries or deaths that could happen to members of the force or civilian component of either Party". (Emphasis added.)

Moreover, KPCC seeks damages to be paid by KBR, not a rescission of the security agreement nor an injunction to return the facility to KPCC.  Such a result, although possibly informed by the security agreement, would have no

bearing whatsoever on the security agreement itself, nor any impact on its implementation by the Government and Iraq.

In sum, at this threshold stage, we cannot reach the merits of KPCC's claims, nor do we opine on their likelihood, *vel non*, to succeed. For the narrow issue at hand—justiciability—KPCC's claims do not run afoul of the political-question doctrine.

### B.

As discussed, in addition to the political-question doctrine, the district court concluded subject-matter jurisdiction was foreclosed by the act-of-state doctrine. *KPCC*, 2016 WL 1259518, at \*22. That doctrine, however, "applies only when the dispute implicates the legitimacy of public acts undertaken by a sovereign nation". *Af-Cap Inc. v. Republic of Congo*, 383 F.3d 361, 372 n.14 (5th Cir. 2004) (citing *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964); *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1112–24 (5th Cir. 1985)). In deciding whether this doctrine applies, courts must look not only to the acts of the named parties, but to any sovereign acts the validity of which would be called into question by adjudication of the action. *Walter Fuller Aircraft Sales, Inc. v. Republic of the Philippines*, 965 F.2d 1375, 1387–88 (5th Cir. 1992). "The burden lies on the proponent of the doctrine to establish the factual predicate for [its] application." *Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 954 (5th Cir. 2011).

As noted, KBR expressly abandons the act-of-state doctrine as a basis for affirmance, perhaps recognizing its weakness. No authority need be cited for our being required, *sua sponte*, to determine whether jurisdiction exists. In any event, KPCC concedes it does not challenge the validity of the security agreement or any action on the part of the Iraqi government. Accordingly, we

19

cannot say that all plausible sets of facts which would permit recovery from KBR would also question a public act undertaken by a sovereign nation.

## C.

A contractor may not be liable for harm resulting from its strict execution of a constitutionally authorized government order. *Yearsley,* 309 U.S. at 20–21. *Yearsley*'s rationale is both sparse and unclear. *See Bynum v. FMC Corp.,* 770 F.2d 556, 564 (5th Cir. 1985) ("[T]he basis of the contractor's defense is not altogether clear from the text of [*Yearsley*]".); *Adkisson v. Jacobs Eng'g Grp., Inc.,* 790 F.3d 641, 646 (6th Cir. 2015) ("[T]he Court never explained the basis of [*Yearsley* immunity]".).

KBR contends it is entitled to immunity under this doctrine, while KPCC asserts the doctrine does not protect KBR. The district court did not decide the question of derivative immunity, ruling our court has held "the government contractor defense is not jurisdictional; therefore claims that fall under its rubric cannot be dismissed under Rule 12(b)(1)". *KPCC*, 2016 WL 1259518, at \*22. In that regard, our court held: "*Yearsley* itself countenances against its application to deprive the federal courts of jurisdiction . . . [and] does not discuss sovereign immunity or otherwise address the court's power to hear the case". *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 207 (5th Cir. 2009). Accordingly, although the parties raised in district court this immunity issue, we do not address the related contentions presented on appeal.

## III.

For the foregoing reasons, the judgment is VACATED and this matter is REMANDED for further proceedings consistent with this opinion.

No. 16-20270

GREGG COSTA, Circuit Judge, concurring in part and dissenting in part:

The Iraq War was the most significant American military engagement since Vietnam. As the United States began to reduce its presence in Iraq, plans were made to turn over security responsibilities to the Iraqis. This lawsuit, though at first glance just a commercial dispute over a dining facility that Kuwait Pearls built in Iraq, asks the judiciary to second guess a sensitive foreign policy determination made during that transition.

As part of the transition process, the United States and Iraq entered into a Security Agreement in 2009. The Security Agreement addresses, among other things, American support in carrying out military operations, control over Iraqi airspace and communication channels, and Iraqi jurisdiction over American military and civilian personnel. The Iraqis also needed access to military bases, so the Security Agreement provides that "Iraq owns all buildings, non-relocatable structures, and assemblies connected to the soil that exist on agreed facilities and areas, including those that are used, constructed, altered, or improved by the United States Forces."

In 2011, at the height of the withdrawal, a contracting officer determined that the facility Kuwait Pearls had built at Forward Operating Base Warrior should be handed over to Iraq under the Security Agreement. In making that decision the officer relied not just on the Security Agreement itself, but a 2009 memorandum and "policy guidance" interpreting the Security Agreement from the then-Commanding General of the Multi-National Force in Iraq. That memo begins by explaining that "[a]n effective transfer of functional facilities is critical to enabling our Iraqi partners to assume increased security responsibility" and thus there was a need for the attached "policy provid[ing] detailed guidance for commanders across [] Iraq on the process and requirements for closing and returning bases to [Iraq]".

21

How do we know that the contracting officer who decided the fate of the dining facility relied on that guidance from the general? She says so in the declaration she submitted in this lawsuit. Evidence contemporaneous to the 2011 decision supports that testimony. The memo notifying KBR that the facility belongs to Iraq reached that determination because the structure was deemed to be "real property," a term mentioned nowhere in the Security Agreement but defined in the general's policy guidance. An email from a different contracting official to KBR a couple weeks before that official decision explains that under "GEN Odierno's memo, if a building is deemed real property[,] it stays to be turned over to the Government of Iraq."

If Kuwait Pearls' lawsuit accepted the legitimacy of the military's decision and just were asking the courts to determine if any legal consequences flowed from it, there would be no problem. As best as can be determined at this early stage of the litigation, that may be the case for some of its liability theories. *See McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1362 (11th Cir. 2007) (allowing suit to proceed because it was not evident, at the present stage of the litigation, that plaintiff's tort claims would call into question military decisions). Resolving the allegation that KBR misled Kuwait Pearls back in 2010 when it entered into a subcontract because it already knew the military would turn the property over to Iraq would not require the court to reassess the propriety of the military's decision. Nor would deciding Kuwait Pearls' allegation that KBR had a contractual obligation to purchase the facility,[1] in which case KBR would be the victim of the military's decision to give Iraq the facility. Limited to such allegations that do not ask for

---

[1] The contract appears to create only an option, not an obligation, for KBR to purchase the facility. The merit of a claim is, however, a separate inquiry from whether it asks the courts to decide a political question.

22

No. 16-20270

reconsideration of the military's interpretation of the Security Agreement, I agree with the majority opinion that the political question doctrine is not a bar.[2]

Although some language in the majority opinion suggests such a limitation on remand, it allows the full case to go forward. And make no mistake about it. Part of this lawsuit—indeed the crux of it—is asking the federal courts to second guess the military's decision to give the property to Iraq. In assessing whether lawsuits might require the courts to weigh in on questions reserved for the political branches, we are instructed to envision how the lawsuit will play out. *Lane v. Halliburton*, 529 F.3d 548, 565 (5th Cir. 2008). That guesswork is not necessary here.[3] Kuwait Pearls told the district court that "the only question [it] must answer is if the Security Agreement covers [Kuwait Pearl's] facility." It tells us that the "reality of this case is simple: FOB Warrior (C7) was not a part of the Security Agreement." Kuwait Pearls Br. at 16; *see also id.* ("[T]he only question the Court may answer is if the Security Agreement covers KPCC's Facility. By [its] express terms, it does not."). There is a lot more to that effect. The district court explained that Kuwait Pearls challenged the military's decision on the grounds that (1) the "Security Agreement does not reference FOB Warrior (C7) nor list it as an 'agreed facility'" and (2) the Security Agreement could not apply to the dining facility because the subcontract between KBR and Kuwait Pearls postdated the countries' agreement.

---

[2] I also agree that the act-of-state doctrine does not apply.

[3] The majority opinion does not conduct that inquiry. It says only that "KBR . . . provides no citation to the record or legal authority to support" its contention that Kuwait Pearls' claims challenge the military's decision to give the facility to Iraq. Maj. Op. at 13. But as noted below, Kuwait Pearls concedes as much time and again.

No. 16-20270

Kuwait Pearls should not be allowed to avoid the litigation choices it made from the beginning and recast its case on appeal to avoid the defect the district court found.[4]  For some of its allegations, no recharacterization can avoid the district court having to decide whether the facility should have been given to Iraq.  Consider Kuwait Pearls' claim seeking only payments for the months KBR allegedly kept using the facility after the military turned it over to Iraq (as opposed to the more significant remedy it seeks of requiring KBR to pay for the entire facility).  It relies on the premise that Kuwait Pearls still owns the facility; a premise that requires the court to disregard or reject the military's determination that the facility belongs to Iraq.

Courts should not be reexamining that decision made in the midst of the withdrawal.  The Constitution vests in the Executive Branch the authority to enter into and enforce agreements with other countries.  *See Saldano v. O'Connell*, 322 F.3d 365, 369 (5th Cir. 2003) ("The dominant consideration in any political question inquiry is whether there is a 'textually demonstrable constitutional commitment of the issue to a coordinate political department.'" (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962))); *Kwan v. United States*, 272 F.3d 1360, 1364 (Fed. Cir. 2001) (finding nonjusticiable a suit demanding compliance with an executive agreement because compliance is a matter of foreign relations); *Goldwater v. Carter*, 444 U.S. 996, 1003–04 (1979) (plurality) (rejecting a challenge to the president's rescission of a treaty as not justiciable).  This textual commitment is at its peak when that authority is exercised in the context of a sensitive military situation like the withdrawal from Iraq, when the United States had an interest in a smooth transition and promoting goodwill with the local forces trying to carry on our country's

---

[4] Of course, after a dismissal without prejudice for lack of jurisdiction like the one here, a party may refile on different grounds if still within the limitations period.  But that is much different from essentially commencing a new suit at the appellate stage.

mission. *Cf. Johnson v. Eisentrager*, 339 U.S. 763, 789 (1950) (stating that the judiciary ought not "entertain private litigation . . . which challenges the legality, the wisdom, or the propriety of" Executive decisions concerning direction of our armed forces).

To the extent Kuwait Pearls is correct that the military's decision was not consistent with the language of the Security Agreement, that would only reinforce the nonjusticiability of this question as a loose reading of the agreement in favor of the Iraqis may have been more of a matter of comity or strategy than legal reasoning. *See Dickson v. Ford*, 521 F.2d 234, 236 (5th Cir. 1975) (dismissing as not justiciable suit against the United States challenging its decision to provide foreign economic aid to Israel; a decision which both the Executive and the Legislative thought "necessary at this time to maintain a balance of forces in the Middle East" (internal quotation omitted)).

Judicial consideration of the question Kuwait Pearls asks the court to decide—whether the military was wrong in determining the facility should be given to Iraq—would also show a lack of respect for the military decisionmakers and the difficult environment in which they reached their decision. *See Baker*, 369 U.S. at 217 (stating that a political question is present when it is impossible for a court to undertake independent resolution without expressing lack of the respect due coordinate branches of government); *Whiteman v. Dorotheum GmbH & Co. KG*, 431 F.3d 57, 73–74 (2d Cir. 2005) (concluding that the fourth *Baker* test prohibited resolving a property dispute because doing so would undermine the foreign policy advanced by an executive agreement); *Aktepe v. United States*, 105 F.3d 1400, 1404 (11th Cir. 1997) (holding that assessment of decisions regarding military operations would show a lack of respect for the Executive).

And a contrary decision from the court would prove embarrassing and confusing, casting doubt on the legal title over the facility even though the

No. 16-20270

federal court has no ability to take it away from the Iraqi government. *Baker*, 369 U.S. at 217 (observing that when there is the potential of embarrassment from multifarious pronouncements by various departments on one question the question is political); *Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 953 (5th Cir. 2011) (noting that reaching the merits in an antitrust claim against OPEC would "involve a policy determination at odds with [the United States'] longstanding policy of diplomatic engagement," which "would inevitably result in embarrassment").[5]

So what are the reasons the majority opinion nonetheless indicates the political question doctrine is not an obstacle even to those allegations that would require the court to reconsider whether the Security Agreement covered the facility?

It first says that the political question doctrine has never been applied to a contract claim. But the application of *Baker* has never turned on the type of claim the plaintiff brings; it turns on whether deciding the claim will require the court to delve into questions committed to another branch. Prior to *Spectrum*, for example, courts had never applied the doctrine to an antitrust claim. Yet we held that those private claims seeking damages were not justiciable because ruling on the merits would require assessing "matters [which] deeply implicate concerns of foreign and defense policy, concerns that

---

[5] The majority opinion devotes a lot of attention to the second *Baker* factor: judicially manageable standards. It's a close call whether such standards exist that would allow a court to determine if the facility should have been turned over to Iraq. The question involves more than just the routine judicial task of interpreting contractual language such as that found in the Security Agreement. The contracting officer also relied on policy guidance a general issued. Courts have enough trouble figuring out what deference is owed to such informal guidance when offered by government officials handling civilian affairs. *See, e.g.*, *United States v. Mead Corp.*, 533 U.S. 218, 239, 250 (2001) (Scalia, J., dissenting). What deference is owed to a general issuing such guidance in the middle of a war zone? But even if the majority opinion is correct that courts are equipped to reevaluate the turnover decision, the presence of any of the six *Baker* factors—and three are discussed above including the most important first factor—renders a question political and prevents us from deciding it.

constitutionally belong in the executive and legislative departments." *Spectrum*, 632 F.3d at 943. Indeed, courts have found political questions presented by various types of claims, including common law ones. *See, e.g.*, *Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum*, 577 F.2d 1196, 1202 (5th Cir. 1978) (tortious conversion); *Whiteman*, 431 F.3d at 59 (compensation for property deprivations). Whether Kuwait Pearls' claims require a reassessment of the 2011 decision to give Iraq the dining facility is the operative question, not the label affixed to them.

The majority opinion also points out that making that assessment would neither call into question the Security Agreement itself nor second guess the government's judgment in entering into it. True, but the political question Kuwait Pearls is asking the court to reassess is the military's subsequent interpretation of the Security Agreement, a decision that took into account extratextual foreign policy and national security considerations in the form of a general's "policy guidance." *See Spectrum*, 632 F.3d at 951 ("Adjudication of the claims before us would require that we review the considered foreign policy of the political branches, which—in contrast to those branches' chosen policy regarding the whaling quotas at issue in *Japan Whaling*—is not codified in a treaty that we are merely asked to interpret.").

Sensitivity to the plight of Kuwait Pearls is understandable. It spent millions to construct a facility and, with the stroke of the military's pen, that property was turned over to another country. Justice, however, requires not just a hurt plaintiff, but also holding liable the party responsible for that loss. Imposing liability on KBR would place it in the same situation Kuwait Pearls is now: having paid millions for a facility that, by virtue of a decision made by the Executive Branch that the Constitution lets it decide, it no longer owns.

The appropriate recourse is for Kuwait Pearls to pursue the remedy that the law provides when the government takes property to further its own

interests: a takings claim. U.S. CONST. amend. V ("[N]or shall private property be taken for public use, without just compensation."). Although the outcome of that litigation in the Court of Federal Claims would be uncertain (it always is in litigation), it at least appears that Kuwait Pearls would be able to assert the takings claim as a third-party beneficiary of KBR's contract with the military. *See Global Freight Sys. Co. W.L.L. v. United States*, 2016 WL 7488356 (Fed. Cl. Dec. 29, 2016). Importantly, that litigation would not raise doubts about the propriety of the military's decision; it would consider only whether that decision makes the government liable for just compensation for the property it decided to give to the Iraqis. *See Langenegger v. United States*, 756 F.2d 1565, 1570 (Fed. Cir. 1985) (holding that a takings suit against the United States for enabling a foreign sovereign's confiscation of property without paying was justiciable because plaintiff did not ask for a determination that the underlying policy was improper, just that a taking had occurred and money was owed). That is a question a court could and should decide. Whether the military acted unlawfully when it gave Iraq the dining facility at FOB Warrior is not.